USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: ______________
DATE FILED: March 29, 2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**ELIZABETH DESOYE,**

**Plaintiff,**

**-against-**

**ANDREW SAUL, *COMMISSIONER OF SOCIAL SECURITY,***

**Defendant.**

**19-CV-6599**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Elizabeth Desoye brings this action challenging the Commissioner of Social Security's (the "Commissioner") final decision finding Plaintiff at fault for the overpayment of widow's insurance benefits ("WIB") under Title XVI of the Social Security Act. 42 U.S.C. §§ 401–433. Currently pending before the Court is Defendant's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF No. 15. The Court has considered the Parties' submissions and for the reasons that follow, Defendant's motion is granted.

## BACKGROUND

### I. Procedural Background

On July 18, 2014, Plaintiff first applied for WIB after her husband passed away in 1996. R. at 18.[1] The Social Security Administration ("SSA") approved Plaintiff's claim, and she began receiving benefits in July 2014. R. at 22. In a letter dated July 7, 2016, the SSA notified Plaintiff of an overpayment amounting to $21,634 for the period of January 1, 2015 through December 31, 2015. R. at 43–44. Plaintiff requested a waiver of the overpayment on July 28, 2016. R. at 50–59. On August 23, 2016, the SSA denied Plaintiff's request for waiver. R. at 62. Subsequently, Plaintiff

[1] "R" refers to the Certified Administrative Record filed at ECF No. 11. Pagination follows original pagination in the Certified Administrative Record.

filed a written request for a social security hearing before an Administrative Law Judge ("ALJ") on October 28, 2016. R. at 74.

ALJ Eskunder Boyd commenced the social security hearing on January 22, 2018. R. at 155. Plaintiff was represented by counsel and appeared and testified in person. The ALJ rendered his decision on February 23, 2018, finding Plaintiff at fault in causing the overpayment under 20 C.F.R. §§ 404.506(a), 404.507, and 404.510. R. at 14–17. Plaintiff requested reconsideration and the SSA Appeals Council denied her request on May 10, 2019. R. at 3–6.

Plaintiff brought this action on July 15, 2019. Compl., ECF No. 2. On April 24, 2020, Commissioner moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Def.'s Mot. J. Pleadings, ECF No. 15. Plaintiff opposed on January 15, 2021. Pl.'s Opposition, ECF No. 27, and Defendant replied on February 12, 2021. ECF No. 30. The Court considers the motion fully briefed.

## II. Factual Background

### A. Plaintiff's Background

Plaintiff was born on March 21, 1954. R. at 19. Plaintiff married her husband, Thomas F. DeSoye, on August 9, 1975. R. at 119. Mr. DeSoye passed away after a lengthy battle with cancer on September 15, 1996. R at 18; 123. At the time of Mr. DeSoye's death, Plaintiff and Mr. DeSoye had three children aged 7, 12, and 15. R. at 123.

The family's financial situation was strained due to Mr. DeSoye's cancer diagnosis and subsequent seven-year treatment. R. at 123. Plaintiff is an attorney and testified that she worked part-time before she began working full-time for Westchester County in 2004. R. at 163. Plaintiff also testified that she sold the family home in October 2008 to fund her children's college

education and subsequently moved into an apartment. R. at 51; 165.[2] Plaintiff worked for Westchester County for seven years before losing her job in 2011. R. at 153; 163.[3] Plaintiff then taught part-time at Fordham University School of Law from September 2011–June 2012. R. at 153.

Plaintiff testified that she moved into her mother's condo in 2010 or 2011 after her youngest child went to college. R. at 165. Plaintiff's mother had a stroke in February 2012 and Plaintiff testified that she acted as her mother's caregiver until she passed away. R. at 166; 177. In August 2012, Plaintiff underwent surgery to remove her ovaries after receiving a cancer diagnosis and had a full hysterectomy the following month. R. at 153; 166. Shortly after Plaintiff's surgery, her family sold her mother's condo, which left Plaintiff without a place to live. R. at 50; 153. Plaintiff then moved in with a friend for nine months. R. at 50; 153. In December 2012, Plaintiff had a third surgery to repair an abdominal hernia. R. at 153. Plaintiff underwent a fourth surgery in September 2013 after a bicycle accident left her with a fractured humerus, which required subsequent physical therapy. R. at 50; 153–154.

Plaintiff secured a full-time job at a law firm, Jones Hirsch, in February 2013. R. at 50; 153. In August 2013, Plaintiff moved into an apartment, which she had to give up after Jones Hirsch folded in June 2014. R. at 50; 154 Unable to support herself, Plaintiff moved into her daughter and son-in-law's home in Ridgefield, Connecticut in August 2014. R. at 50; 154. Plaintiff

---

[2] The record reflects conflicting dates for the sale of Plaintiff's family home. Plaintiff stated that she sold the house in October 2008 in the letter attached to her request for waiver of the overpayment. R. at 51. Plaintiff also testified before the ALJ on January 22, 2018 that she sold the house "in 2008." R. at 165. However, the timeline attached to the Request for Review submitted by Plaintiff's attorney following the ALJ's decision states that Plaintiff sold her home in December 2006. R. at 153.

[3] The record also reflects conflicting dates for when Plaintiff lost her job with Westchester County. Plaintiff stated that she lost her job in May 2011 in the letter attached to her request for waiver of the overpayment. R. at 50. The timeline attached to the Request for Review submitted by Plaintiff's attorney following the ALJ's decision states that Plaintiff lost her job in April 2011. R. at 153. Plaintiff testified before the ALJ on January 22, 2018 that she lost her job in June 2011. R. at 164.

secured inconsistent part-time work from August 2014 through mid-January 2015. R. at 50. In March 2015, Plaintiff began working as a full-time associate attorney at Baker, Leshko, Saline & Drapeau, a law firm in White Plains, New York. R. at 50; 154.

### B. History of Plaintiff's WIB Claim

#### i. Plaintiff's Initial WIB Filing

Plaintiff applied for WIB on July 18, 2014 and received approval for benefits retroactive to July 2014. R. at 18; 22. The SSA granted Plaintiff $1,777 per month for 2014. R. at 22–29. In the Notice of Award letter dated July 25, 2014, the SSA included a notice on the first page that stated: "Your benefits are based on the information you gave us. If this information changes, it could affect your benefits. For this reason, it is important that you report changes to us right away." R. at 22. A pamphlet included in the envelope detailed the kind of information that must be reported to the SSA and how beneficiaries could report changes. R. at 22. In August 2014, Plaintiff moved into her daughter's home in Ridgefield, CT and notified the SSA of the change of address. R. at 119. Plaintiff continued to receive her monthly benefits. R. at 119. The SSA confirmed receipt of the address change in a letter dated December 30, 2014. R. at 33.

In a letter dated October 28, 2014 and mailed to Plaintiff's old address, the SSA advised Plaintiff that her monthly amount for the remainder of 2014 would be calculated based on her anticipated income of $47,000. R. at 26. The letter also advised Plaintiff that her 2015 benefits would be calculated based on her anticipated income of $30,000. R. at 26. The letter directed Plaintiff to check her expected earnings and let the SSA know if she would be making more or less than $47,000 in 2014. R. at 26. The last page of this letter included a reminder of the SSA's yearly earnings limit and explicitly stated:

> Each year there is a limit to the amount you can earn for the year and still qualify for full benefits. If you earn over the allotted amount for the year, we usually withhold $1 in benefits for every $2 you earn above the limit.
>
> When we know that you expect to earn over the limit, we withhold benefits. At the end of the year, when we know how much you actually earned, we pay any additional benefits that you are due. Or if we paid you too much in benefits, we ask that you pay us back.

R. at 29. There was also a directive to report any change in earnings to the SSA. R. at 29. A second letter sent on December 15, 2014, also to Plaintiff's old address, stated that the SSA could not pay her benefits beginning January 2015 "because of work" and that Plaintiff's benefits for the month of December 2014 would increase to $1,807. R. at 30–31. Plaintiff claims that she did not receive either of the October 2014 or December 2014 letters because the SSA had mailed them to her old address. R. at 119.

Plaintiff moved out of her daughter's home and into an apartment in Ridgefield, CT in early March 2015. R. at 120. Plaintiff again notified the SSA of her address change. R. at 120. A letter mailed to Plaintiff's daughter's address on February 20, 2015 stated that Plaintiff's WIB amount would be changed to $1,807 per month in accordance with her report that she would be earning $15,000 in 2015. R. at 35. The letter also directed Plaintiff to update the SSA if her income was more or less than $15,000. R. at 36.

**ii. 2015 Overpayment**

On July 7, 2016, the SSA sent Plaintiff a letter informing her that because she earned $59,230 in 2015, she was not entitled to receive WIB for 2015. R. at 43. The letter specified that Plaintiff received overpayments totaling $21,684 (or $1,807 per month) in 2015 and that Plaintiff would need to repay that amount to the SSA. R. at 43–44. Plaintiff sent a written request for a waiver of the overpayment on July 28, 2016. R. at 50–51. Plaintiff's letter stated that she could not afford to repay the $21,684 due to financial hardship. R. at 50–51.

On August 5, 2016, Plaintiff filed a request for waiver of overpayment recovery, which stated that she was not at fault for the overpayment and that she could not afford to repay it. R. at 52–59. Plaintiff indicated that she was not at fault for the overpayment because she "honestly thought that any overpayment was squared away by [her] income tax return." R. at 53. Plaintiff also indicated that she did not inform the SSA about the change in her income because she "didn't realize [the] onus was on [her] to stop payment" and "thought [her] obligation was to pay taxes as [she] did for 2015." R. at 53. Plaintiff stated that she would "be unable to meet expenses" if she had to repay the $21,634. R. at 54. In the financial statement of the overpayment waiver, Plaintiff reported that her net income for 2016 was $5,063 per month and that her monthly expenses in 2016 totaled $6,737 per month. R. at 56–57. Plaintiff reported no assets except for a checking account with a balance of $1,150 and indicated that she owes $230,000 in student loans that she incurred on behalf of her three children for their college education. R. at 55; 57. Plaintiff also reported that she owed approximately $7,000 in back taxes to the IRS for 2014 and 2015. R. at 58.

In a letter dated August 23, 2016, the SSA denied Plaintiff's request for waiver of recovery of the overpayment. R. at 62. The letter informed Plaintiff that she had a right to a personal conference with a SSA employee to explain why she believes she should be granted the waiver and a right to review her file prior to the conference. R. at 62. The letter also indicated that the SSA had scheduled her personal conference for August 30, 2016 at 9:00AM with a Mrs. P. Rosario. R. at 62. A second letter dated August 24, 2016 informed Plaintiff that she would continue to receive benefits in the amount of $1,355 per month until the SSA decided if it would waive the collection of the overpayment. R. at 65–66.

On September 12, 2016, Plaintiff received a letter from the SSA stating that she did not show up to her personal conference with Mrs. Rosario and that the conference was rescheduled for

September 23, 2016 at 9:00AM. R. at 67. Plaintiff alleges that she left a voicemail to reschedule the date of the conference because she could not make it on such short notice and that the letter stating that she did not show up to the conference is inaccurate. R. at 150. Plaintiff testified that on the date of the rescheduled conference, Mrs. Rosario referenced a letter or letters that appeared to have been undelivered, but would not elaborate on what she meant when Plaintiff inquired. R. at 181–182. Plaintiff alleges that Mrs. Rosario stated that the content of the undeliverable mail was inconsequential because Plaintiff still had the obligation to make the repayment. R. at 151.

On October 3, 2016, the SSA mailed Plaintiff a letter that stated it could not pay her benefits beginning January 2015 and that Plaintiff could no longer receive her monthly benefits. R. at 69. The letter also indicated that SSA records showed that Plaintiff expected to earn $60,000 in 2016 and 2017. R. at 69. Additionally, the letter stated that Plaintiff had received an overpayment of benefits totaling $16,263 ($1,807 per month) in 2016 and that Plaintiff owed a total of $21,684. R. at 69. Plaintiff retained counsel and submitted a request for a hearing before an ALJ on October 28, 2016. R. at 74; 151. On December 5, 2016, the SSA denied Plaintiff's waiver request as a result of her personal conference and ordered her to repay the full $21,684. R. at 82.

In January 2018, Plaintiff traveled to the SSA office in New Haven, CT to obtain a copy of her file, but could not acquire it in person. R. at 152. The New Haven office instead sent the records via express mail. R. at 152. An employee at the New Haven office informed Plaintiff that the mailed packet would only contain what the local Danbury, CT office submitted as exhibits and it was consequently not a complete record. R. at 152. Plaintiff then visited the Danbury office to obtain a complete copy of her file. R. at 152. The district clerk prepared a waiver form for Plaintiff, which she signed, and told her to expect a CD containing her files in 7–10 days. R. at 152.

On January 10, 2018, the SSA sent Plaintiff a letter denying her request for her records because the consent waiver she provided was too broad. R. at 125. The letter explained that "the consent must be directed to SSA, must specify the records or information that may be disclosed, the reason you are requesting the information, and to whom such disclosure may be made." R. at 125. The letter indicated that the SSA will not honor requests for "all records, all information, or other similar blank requests." R. at 125. Accordingly, the letter directed Plaintiff to submit the appropriate consent if she wanted to examine her records. R. at 125.

**iii. Hearing Before the ALJ**

Plaintiff was represented by her attorney and appeared and testified before ALJ Boyd on January 22, 2018. R. at 155-188. At the hearing, Plaintiff testified that she was aware of the yearly income limitations placed on WIB recipients, stating that "someone probably informed [her] that there would be a penalty if I went over a certain amount," but that she did not recall what that amount was. R. at 170. Plaintiff also testified that she was working at Baker, Leshko, Saline & Drapeau on a part-time basis in January 2015, but failed to apprise the SSA that she had begun working because it "didn't occur to [her]." R. at 172. Plaintiff began working as a full-time employee at Baker, Leshko, Saline & Drapeau in March 2015, which she also did not report to the SSA. R. at 50. Plaintiff additionally testified that she had her taxes filed by an accountant in 2015 due to it being "such a confusing year." R. at 174. The IRS found that Plaintiff owed approximately $8,000 in back taxes for 2015, and Plaintiff stated that she believed any overpayments would be reconciled by taking the money out of her tax returns. R. at 171–176.

At the hearing, Plaintiff expressed concern that she was unable to see the undelivered letters Mrs. Rosario referred to during her personal conference and was unable to examine her complete record from 2015. R. at 159; 181–182. The ALJ explained that overpayment cases are usually

"paper cases" and Plaintiff did not receive a CD containing her files because they had not been digitized. R. at 159–160. The ALJ assured Plaintiff that he would consult with the SSA office in Danbury, CT to see if they could provide him with the letters that she allegedly did not receive because they were mailed to her old address. R. at 182–183. The ALJ also stated that he would make sure to get copies of the letters to Plaintiff and her attorney. R. at 183.

**iv. The ALJ's Decision**

In a decision dated February 23, 2018, ALJ Boyd found Plaintiff to be at fault in causing the overpayment for the period of January 1, 2015 through December 31, 2015 because "she failed to furnish information that she knew or should have known was material." R. at 16. First, Plaintiff stated that she was aware of earning limitations on WIB and earned $59,230 in 2015, which is well above the substantial gainful earning threshold. R. at 16. Second, Plaintiff received a notice of award from the SSA that outlined her reporting responsibilities and received multiple notices thereafter that reiterated the need for her to report any change in her work status. R. at 16. Finally, a consideration of pertinent circumstances yielded that Plaintiff is able to work full-time and does not have any physical, mental, educational, or linguistic limitations that would impair her understanding of her responsibilities to keep the SSA apprised of changes in yearly earnings and/or work status. R. at 16.

On May 10, 2019, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision, citing her testimony that she did not inform the SSA when she began working in 2015. R. at 3. The letter also stated that SSA records indicated that Plaintiff earned $105,384 in 2017 and $123,269 in 2018 and she therefore has the ability to repay the full overpayment amount. R. at 3. The letter rendered the ALJ's decision final and directed Plaintiff to file a civil action if she disagreed with the Appeals Council's action. R. at 3.

## STANDARD OF REVIEW

### I. Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted)).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

### II. Recovery of Overpayments Under 42 U.S.C. § 404

Whenever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made to any person receiving social security benefits, proper recovery shall be made unless: (1) the overpaid individual is found to be without fault in causing the overpayment; and (2) recovery would defeat the purpose of Title II of the Social Security Act or would be against equity and good conscience. 42 U.S.C. § 404(a)(1); 42 U.S.C. § 404(b)(1). The recipient may be found at fault if they: (1) made a statement that they know or should have known to be incorrect; (2) failed to provide information that they know or should have known to be

material; or (3) accepted a payment that they knew or could have been expected to know was incorrect. *Center v. Schweiker*, 704 F.2d 678, 680 (2d Cir. 1983). In situations involving the recovery of overpayments, the burden is on the plaintiff to show that they qualify for a waiver of recovery. *Posnack v. Sec'y of Health and Human Serv.*, 631 F. Supp. 1012, 1015 (E.D.N.Y. 1986).

## DISCUSSION

Plaintiff argues that the ALJ's decision finding her at fault for the overpayment is not supported by substantial evidence and that the ALJ failed to properly develop the record. The Court finds that the ALJ's decision was supported by substantial evidence and was not legally erroneous.

### I. Plaintiff Is at Fault for the 2015 WIB Overpayment

Plaintiff contends that she is not at fault for the overpayment because she believed that the IRS would deduct any overpayments from her income tax refund. R. at 53;172–173. In cases regarding the overpayment of benefits, an honest mistake may be sufficient to constitute fault on the part of the recipient; no showing of bad faith is required. *Center*, 704 F.2d at 680 (citing *Morgan v. Finch,* 423 F.2d 551, 553 (6th Cir. 1970)). An individual will not be without fault if the SSA has evidence in its possession that shows either a lack of good faith or a failure to exercise a high degree of care in determining whether circumstances that may cause deductions from their benefits should be brought to the attention of the SSA by an immediate report or by return of a benefit check. 20 C.F.R. § 404.511.

A court must consider all pertinent circumstances, including the individual's age and intelligence, and any physical, mental, educational, or linguistic limitations, when determining whether an individual is not without fault in causing an overpayment. 20 C.F.R. § 404.507. If the recipient is not without fault in causing the overpayment, a court need not consider whether

recovery of the overpayment would defeat the purpose of Title II of the Social Security Act or would be against equity and good conscience. *Chlieb v. Hecker*, 777 F.2d 842, 846 (2d Cir. 1985).

Here, Plaintiff was not without fault in causing the overpayment of her benefits. Plaintiff is currently employed as an attorney. R. at 173–174; Pl. Mem. Opp. Mot. J. Pleadings, ECF No. 27. She was born in 1954 and has no documented mental impairments. R. at 19. Upon approval of her WIB claim, Plaintiff received a Notice of Award that stated the amount she received each month was calculated based on information she had provided when filling out her application. R. at 22. An included pamphlet detailed what kind of information must be reported to the SSA and how beneficiaries could report changes. R. at 22.

Moreover, the SSA mailed another letter to Plaintiff on February 20, 2015, which stated that Plaintiff's monthly benefits would increase to $1,807 based on her report that she was expecting to earn $15,000 in 2015. R. at 35. The February 2015 letter also directed Plaintiff to let the SSA know if her expected income for 2015 was more or less than $15,000. R. at 36. Plaintiff, however, failed to inform the SSA that she was hired as a full-time employee at Baker, Leshko, Saline & Drapeau in March 2015 and failed to report her earnings totaling $59,230 for that year. R. at 50. Additionally, Plaintiff testified that "someone probably informed [her]" of the yearly income limitations placed on WIB recipients. R. at 170. Even if Plaintiff testified that she had no memory of being informed of such limitations, the receipt of the July 2014 Notice of Award and the February 2015 letter are sufficient to find that she should have been aware. *See Nieves v. Comm'r of Social Sec.*, 15 Civ. 4460, 2016 WL 3791126, at *4 (S.D.N.Y. July 12, 2016) (finding a plaintiff at fault for benefits overpayment where he received multiple letters detailing his responsibility to report his income and he testified that he "did not pay as much attention to the contents of the letters beyond what was written on the first page").

Plaintiff's argument that she is without fault in causing the overpayment because she believed that any overpaid benefits would be automatically deducted from her income tax refund is without merit. This Court has held that an ALJ can properly disregard a plaintiff's claim that they believed any income reporting requirement to the SSA had been satisfied by any tax filings with the IRS where the plaintiff had received multiple letters from the SSA detailing the reporting requirement. *See Nieves*, 2016 WL 3791126, at *4. As the ALJ stated in his decision, although Plaintiff's WIB counts as income for tax purposes, this is a separate issue from that of the overpayment. R. at 16.

Assuming that Plaintiff's claim that she never received the October and December 2014 letters is true, Plaintiff still has received sufficient communication from the SSA to indicate that she knew or should have known of her responsibility to report any changes in her income directly to the SSA. Furthermore, Plaintiff does not contend that she held this belief regarding her income tax returns because she was misled by any written communication from or an employee of the SSA. *See Lewicki v. Sec'y of Health and Human Serv.*, No. 86 CV 411, 1987 WL 12590, at *1 (W.D.N.Y. Feb. 17, 1987) (holding that plaintiff was not at fault for receiving an overpayment of benefits from both the SSA and Railroad Retirement where the written notices to plaintiff from both agencies were exceptionally unclear regarding the total amount of benefits plaintiff was entitled to from those entities).

Plaintiff failed to provide information that she knew or should have known was material to the calculation of her monthly benefits. 20 C.F.R. § 404.507(b). Accordingly, the ALJ's finding that Plaintiff is at fault for the overpayment is supported by substantial evidence. While the Court understands that the Plaintiff is experiencing financial hardship due to years of underemployment and unemployment, medical bills, and loan debt incurred for her children's education, the Plaintiff

is not without fault in causing the overpayment, and therefore this Court need not consider whether recovery of the overpayment would defeat the purposes of the Social Security Act or would be against equity or good conscience. *Chlieb*, 777 F.2d at 846.

**II. The ALJ Fulfilled His Duty to Affirmatively Develop the Record**

Plaintiff contends that the ALJ failed to properly develop the record because he did not "investigate the missing sixteen months of records from the end of February 2015 through July 2016 that overlapped the alleged overpayment period" and their production could have necessitated a supplemental hearing. Pl. Mem. Opp. Mot. J. Pleadings, ECF No. 27. Unlike a judge in a trial, the social security ALJ must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even when a claimant is represented by counsel. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits. *Id.* at 112–113. Due to the ALJ's affirmative duty to develop the record, they must take into consideration documents that are both relevant and available at the time of the hearing. *Rose v. Comm'r of Social Sec.*, 202 F. Supp. 3d 231, 242 (E.D.N.Y. 2016). While the ALJ must supplement the record through their own initiative when the record is incomplete or inadequate, this burden does not attach when the record is ample. *Valoy v. Barnhart*, No. 02 Civ. 8955, 2004 WL 439424, at *7 (S.D.N.Y. Mar. 9, 2004).

Here, the ALJ fulfilled his duty to develop the record because the evidence provided was sufficient to find Plaintiff at fault for the overpayment, and the record was therefore adequate. Even without the allegedly missing records from February 2015 through July 2016, there is ample evidence demonstrating that Plaintiff was put on notice to report any changes in her income to the SSA and that her benefits were calculated based on the information that she provides to the agency.

The July 2014 Notice of Award and the February 2015 letter detailing Plaintiff's WIB adjustment for 2015 based on her reported income clearly indicated that Plaintiff was required to report any adjustments in earned income. R. at 22; 35–36. As Plaintiff denies receipt of only the October and December 2014 letters, it is assumed that she received both the July 2014 and February 2015 letters and had an opportunity to review them. R. at 119. Additionally, Plaintiff testified that she was aware of the yearly income limitations placed on WIB recipients. R. at 170. Moreover, Plaintiff fails to specify how she believes these missing records would impact her case. *See Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (finding the plaintiff's record supplementation argument "baseless" where the plaintiff failed to identify the specific records that were supposedly missing and failed to explain how their procurement would affect her case). Therefore, Plaintiff was given sufficient notice of income reporting requirements and it was not necessary for the ALJ to supplement the record.

Even if the ALJ had failed to fully develop the record, it would constitute harmless error because procurement of Plaintiff's records from the period in question would not have altered the ALJ's findings. In the context of social security appeals, a legal error committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate conclusion when considering the record as a whole. *See Williams v. Astrue*, No. 11 CV 5300, 2012 WL 2012027, at *2 (W.D. Wash. Apr. 27, 2012); *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties"); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (holding that a decision of an ALJ will not be reversed for errors that are harmless).

There is nothing in the record that suggests that a procurement of Plaintiff's records and/or undelivered communications from the SSA to Plaintiff for the period between February 2015 through July 2016 would alter the conclusion that Plaintiff had received ample instruction and notice prior to February 2015 that she was responsible for reporting changes in her income to the SSA. Therefore, there is no reasonable possibility that any new evidence from the period at issue would have influenced the ALJ to decide Plaintiff's claim differently and its exclusion from the record did not violate Plaintiff's substantial rights.

**CONCLUSION**

For all the aforementioned reasons, Defendant's Motion for Judgment on the Pleadings is granted. ECF No. 15.

**SO ORDERED.**

**Dated: March 29, 2021**

**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**